No. 21,244.

THE STATE OF KANSAS, *Appellee,* v. JOHN LONG, *Appellant.*

SYLLABUS BY THE COURT.

1. HOMICIDE—*Evidence Warranted Verdict.* The evidence was sufficient to warrant a verdict of guilty of murder in the second degree.

2. SAME—*Evidence—Repetition of Vulgar and Obscene Language.* A conviction of murder in the second degree will not be reversed on account of witnesses not being permitted to repeat vulgar and obscene language used in threats by the deceased toward the defendant, where the witnesses give the other language used in the threats, repeat the profane language, and describe the vulgar and obscene language.

3. SAME—*Evidence—Improper Cross-examination.* On the cross-examination of a witness, it is not error to exclude evidence on matters not testified to in chief, although that evidence concerns transactions connected with the facts in controversy.

4. SAME—*Evidence Properly Rejected.* There is no reversible error in refusing to permit a witness to give the substance of a conversation, where the witness states that he cannot give the substance of that conversation.

5. SAME—*Self-defense — Evidence by Defendant.* On a murder trial, where the accused testifies that the deceased had threatened to kill him; that he believed the deceased intended to kill him, and was trying to do so; and that the accused was acting in self-defense, it is not error to refuse to permit him to testify further concerning what he believed to be the extent of his danger.

6. SAME—*Evidence—General Reputation of Deceased.* One who is on trial charged with murder may show, by general reputation, that the deceased was a quarrelsome, turbulent, and dangerous man, and may show that information of that fact had been communicated to him; but a judgment of conviction will not be reversed for error in excluding evidence of communication of that information, where the whole of the evidence established that the defendant must have known, at the time of the homicide, that the deceased was quarrelsome, turbulent, and dangerous.

7. SAME—*Refusal to Reopen Trial—No Error.* It is not error to refuse to reopen a trial for the purpose of permitting the introduction of evidence, where that evidence was known to the party making application, and no sufficient reason is given for not introducing the evidence before the trial closed.

8. SAME—*Proper Admonition to Jurors.* On a murder trial, when it becomes necessary to permit one of the jurors to go to his home, it is not error for the court to strictly admonish the jurors concerning their duty while the one juror is away, and it is not error for the court to call the attention of the jurors to the fact that rumors concerning their misconduct have been in circulation.

9. SAME—*Arguments of Counsel.* There was nothing in the argument of counsel to justify a reversal of the judgment.

Appeal from Barton district court; DANIEL A. BANTA, judge. Opinion filed July 6, 1918. Affirmed.

*Carr W. Taylor,* of Hutchinson, and *Charles L. Carroll,* of Great Bend, for the appellant.

*S. M. Brewster,* attorney-general, *S. N. Hawkes,* and *John L. Hunt,* assistants attorney-general, *Clyde Allphin,* county attorney, *F. V. Russell,* and *R. C. Russell,* both of Great Bend, for the appellee.

The opinion of the court was delivered by

MARSHALL, J.: The defendant appeals from a judgment convicting him of murder in the second degree. He complains of a number of matters.

1. One of these complaints is "that under no construction

that can be placed upon the evidence in this case was the defendant, under the law, guilty of either degree of murder; and that the verdict should have been set aside and a new trial granted because the evidence shows conclusively that no offense greater than some degree of manslaughter was committed."

There was evidence which tended to show the following facts:

John Long operated a gambling room in Hoisington, in Barton county. On the night of March 19, 1916, he, with Robert Lockridge, William Kimball, and a number of others, was in this room gambling—playing poker and shooting craps. A quarrel arose, and fierce fights ensued between Lockridge and Kimball, in which Long took part. The entire party then left the gambling room—Kimball going to his room in a rooming house, and Long going to a restaurant. While Long was in the restaurant, Lockridge came in. Long saw Lockridge, and immediately went out the back door. Lockridge soon followed. Long went to Kimball's room and asked for admission; this was at first refused, but upon a second request, Kimball recognized Long's voice and admitted him. Long at once asked Kimball where his gun was. Kimball had a .45-caliber revolver in his hand. Long took the gun away from Kimball. He advised Long not to go outside and do any shooting. Long immediately went outside, and on the sidewalk said: "God damn you, I will shoot you." He soon commenced shooting at Lockridge. The shooting occurred in an alley. Long shot at Lockridge four or five times, and hit him in the back. Lockridge had no firearms, and, when shot, was running away from Long.

Much of the evidence was conflicting, and many of the facts above stated were disputed by abundant evidence. The facts detailed were not all that tended to prove the defendant's guilt, but they were sufficient to warrant the jury in finding the defendant guilty of murder in the second degree.

2. The defendant was not permitted to prove the exact language used by Lockridge at the time of the shooting and immediately prior thereto. The witnesses were permitted to testify that Lockridge threatened to kill the defendant; that Lockridge cursed the defendant (the witnesses used the exact language of Lockridge in these respects); and that Lockridge

applied to the defendant vile and obscene epithets, such as the
witnesses did not want to repeat in the court room.   The de-
fendant insisted that the exact language should be repeated.
The court said: "You need not repeat any vulgar or obscene ex-
pressions that was made use of.   You may designate the char-
acter of the language without repeating it."   This rule was
followed throughout the trial.   It appeared on the evidence
introduced on the motion for a new trial that the epithets ap-
plied to the defendant by Lockridge were of the vilest char-
acter.   Probably the witnesses should have been required to
repeat the exact language, but it was not reversible error to
refuse to do so.   No substantial right of the defendant was
thereby violated.   The jury must have understood that lan-
guage which could not be repeated in the court room must have
been of the vilest character.   The defendant received all the
benefit from that evidence that could have been received from
the use of the exact language.   The conclusion here reached
is supported by 2 Wigmore on Evidence, §§ 1159, 2180; 14
Ency. of Ev. 219; *Bell v. The State,* 31 Tenn. (1 Swan's
Rep.) 42.

3. The defendant complains of the exclusion of certain evi-
dence which he attempted to introduce on the cross-examina-
tion of William Kimball, who was a witness for the state.   The
following occurred:

"Q. About how many minutes was it before Mr. Long came to your
door to get in after you saw him last?   A.  Something like ten or fifteen
minutes, I think.   Long and myself had been together about fifteen
minutes before he came to the door to get in.

"Q. Was the deceased with you and Mr. Long fifteen minutes be-
fore?   [Excluded.]

"Q. Do you know who it was that came up out in front of your room
at the time that Mr. Long was getting the gun?   [Excluded.]

•     •     •     •     •     •     •     •     •     •     •     •

"Q. How did you come to have this big gun in your hand when Long
knocked at the door?   A.  Well, I had that in my hand for personal safety.

"Q. Were you expecting somebody to attack you?"   [Excluded.]

The defendant pleaded self-defense, and contends that by
these questions he sought to establish facts that were a part of
the *res gestæ.*   The evidence was objected to because it was not
proper cross-examination, and was excluded.   In his exam-

ination in chief, Kimball was not questioned on any of these matters. The objections were, therefore, properly sustained.

Kimball was placed on the stand as a witness for the defendant, and he could have been then questioned concerning everything connected with the shooting.

4. Another complaint is that the court refused to permit a witness to give the substance of the language used by Lockridge when he was going through the restaurant after Long. The following occurred at the trial:·

"Q. Can you state to the jury in substance what Mr. Lockridge said? A. Not his exact words.

"Q. Not his exact words but what you remember in substance that he said?

"By Mr. Russell: Objected to as incompetent, irrelevant and immaterial.

"By the Court: I think it is a dangerous thing to do. If the witness knows what he said he may repeat it; but I think it is dangerous to attempt to say in substance what he said.

"Q. Do you know what he said in substance?

"By Mr. Russell: Objected to as incompetent, irrelevant and immaterial; as the witness has testified in chief that he does n't know. Could n't remember.

"By the Court: Are you able to state now what language Lockridge used as he went through the room? A. No, I could n't say just the language he used.

"By Mr. Taylor: Can you tell in substance?

"A. No, none other than I heard him mumbling as he went through the restaurant."

The last answer of the witness disposes of this proposition. He testified that he could not tell the substance of what Lockridge said. No error was committed.

5. The defendant sought to introduce evidence concerning what he believed to be the extent of his danger. He testified that Lockridge said he was going to kill him; that he believed that Lockridge intended to kill him; that Lockridge was trying to do so; and that he acted in self-defense in shooting at Lockridge, but did not intend to kill him. The defenant was asked the following question:

"Q. Now you may state, Mr. Long, whether or not, when you first went to Kimball's room and grabbed the revolver—you may state to the jury what you believed was the extent of your danger."

The defendant was not permitted to answer the question. He

The State v. Long.

testified to the fullest possible extent of danger to himself. No greater degree of danger could be described.

6. The defendant complains that he was not permitted to show specific acts of personal violence on the part of Lockridge, nor to show that knowledge of these acts had been previously communicated to the defendant. Evidence was introduced on rebuttal which tended to show that Lockridge was a quarrelsome, turbulent, and dangerous man. This was done by showing his general reputation. ·

"Where character evidence is offered in support of the contention that the deceased was the aggressor or to characterize and explain his acts, the defense is restricted to proof of general reputation in the community where the deceased lived, and may not show particular acts or conduct at specified times. It may not be shown that the deceased had engaged in frequent fights in which he used deadly weapons, and therewith made deadly assaults on his antagonists." (13 R. C. L. 919.) (See, also, 6 Ency. of Ev. 780; 1 Wigmore on Evidence, §§ 63, 246.)

The defendant was not permitted to answer the following question:

"Q. I will ask if you had heard conversations, by persons round in that community, with reference to his being a turbulent, and quarrelsome and dangerous man?"

The question was a proper one, and should have been answered. (*The State v. Burton,* 63 Kan. 602, 66 Pac. 633; Note, L. R. A. 1916 A, 1245.)

Was the defendant prejudiced by the exclusion of that evidence? On the night of the shooting, he had seen enough to completely inform him that Lockridge was a quarrelsome, turbulent, and dangerous man. The jury must have understood that fact from the evidence. The exclusion of the evidence does not appear to have been prejudicial.

7. Complaint is made of the exclusion of the dying declaration made by Lockridge. It appears that Lockridge made a written dying declaration in the presence of the county attorney, the sheriff, and J. J. Norton. The state did not introduce the declaration in evidence, either in chief or in rebuttal. The defendant did not attempt to introduce it until after both parties had rested, although counsel for the defendant had knowledge that the declaration existed. The request for the introduction of the declaration came by way of a

motion. The court denied the request in the following language:

"Now on this the 9th day of June, 1916, after the evidence in the case was closed by both the state and the defendant, and after the instructions were prepared and ready to be read to the jury; the defendant presents a certain motion, asking that the county attorney be put under oath, and required to give evidence concerning, and to produce a certain document, which, the defendant alleges in said motion, he understands to be a dying statement or declaration of the deceased, and to furnish the defendant with a copy thereof; and after due consideration, the court overrules said motion."

It does not appear why the defendant did not attempt to introduce the declaration before he closed his evidence.

Under the circumstances, the request came too late. It does not appear that the introduction of the declaration would have been of any advantage to the defendant. It was not error to refuse to reopen the case for the purpose of permitting the declaration to be introduced.

8. Complaint is made of certain remarks made by the court to the jury. On the trial it became necessary to excuse one of the jurors. The court very carefully admonished the jurors concerning their duty during their separation, and, in the course of his remarks, stated:

"That some gentleman whose name I do not now remember had stated to him that one of the jurors had been seen and that there would be no verdict from this jury. Now I think that was simply a wild rumor. I sincerely hope that it is not a fact."

The court then instructed the jury concerning the great responsibility that rests on the shoulders of jurors, and the absolute necessity of their acting with the strictest integrity. One of the jurors then remarked:

"I think if you had been in the jury room, and seen how we were laboring consciensciously and to the best of our ability, I think you would be well satisfied in your own mind that the information given to you is absolutely false."

To that remark the court replied:

"I don't think there is anything to it. I think the wish was father to the thought in the breast of whoever circulated it. I don't remember the person who made the statement; but I told my informant that I did n't think there was anything to it at all."

There was nothing in what the court said that was in the

least degree prejudicial to the rights of the defendant, or that was in any way inconsistent with the duty of the court.

9. The defendant complains of the argument of counsel for the state. The argument as abstracted by both the defendant and the state has been examined. It does not appear that there was anything improper in the argument. Everything that was said was based on the evidence introduced, and was justified by that evidence.

The judgment is affirmed.